IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**JOANN ROSE RYAN STANLEY**,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

No. 6:15-cv-02403-MO

OPINION AND ORDER

**MOSMAN, J.**,

    Plaintiff Joann Ryan Stanley[1] challenges the Commissioner's decision denying her claim for Disability Insurance Benefits. I have jurisdiction under 42 U.S.C. § 405(g) to review the Administrative Law Judge's ("ALJ) decision. For the reasons stated below, I AFFIRM the ALJ's decision.

**PROCEDURAL BACKGROUND**

    Ms. Stanley filed her application for Title II Disability Insurance Benefits to the Commissioner on August 1, 2012, alleging a disability onset date of August 1, 2002. The claim was initially denied on January 31, 2013, and again upon reconsideration on May 29, 2013. Ms.

---

[1] Throughout Plaintiff's brief, Plaintiff is referred to as "Ms. Standley." While a "Ms. Standley" with a "d" almost certainly exists somewhere in the world, I am persuaded from the Complaint [1] and record of proceedings below, that the Plaintiff in this case is "Ms. Stanley," and will refer to her as such.

1 - OPINION AND ORDER

Stanley then filed a timely request on August 2, 2013, for a hearing to review the Commissioner's decision. An ALJ held a hearing on February 10, 2014, after which Ms. Stanley amended her alleged onset date to May 4, 2012. The ALJ subsequently issued a decision on April 21, 2014, which denied Ms. Stanley's claim for Disability Insurance Benefits on the basis that she was not disabled, as defined by the Social Security Act, during the period of May 4, 2012 to June 30, 2012.

## THE ALJ'S FINDINGS

The ALJ made his decision based upon the five-step sequential evaluation process established by the Secretary of Health and Human Services. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 416.920 (establishing the five-step evaluative process for SSI claims).

At Step One, the ALJ determined that Ms. Stanley did not engage in substantial gainful activity during the period from her amended alleged onset date of May 4, 2012, through her date last insured of June 30, 2012.

At Step Two, the ALJ determined that Ms. Stanley had the following severe impairments: history of acute myocardial infarction, obesity, bradycardia/hypotension, and recurrent angina.

At Step Three, the ALJ determined that, as of her date last insured, Ms. Stanley did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment under 20 C.F.R. Part 404, Subpart P.

Next, the ALJ determined that Ms. Stanley had the residual functional capacity to perform medium work, with the restrictions that she could not climb ladders, ropes, or scaffolds more than occasionally and that she could not climb ramps, or stairs more than frequently.

At Step Four, the ALJ determined that Ms. Stanley did not have past relevant work.

Finally, at Step Five, the ALJ determined that, given Ms. Stanley's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that she could have performed as of her date last insured. Specifically, the Vocational Expert testified that Ms. Stanley could work as a cleaner, laundry worker, or hand packager. Therefore, she was not disabled, as defined by the Social Security Act, at any time through her date last insured.

## STANDARD OF REVIEW

I review the ALJ's decision to ensure the ALJ applied proper legal standards and that the ALJ's findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (explaining that the ALJ's decision must be supported by substantial evidence and not based on legal error). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins*, 466 F.3d at 882.

## DISCUSSION

Ms. Stanley argues the ALJ erred as a matter of law in denying her claim for disability benefits because his decision is not supported by substantial evidence in the record. Specifically, she alleges the ALJ failed to (1) give adequate weight to the opinion of her treating physician, (2) adequately assess her credibility, (3) adequately determine her residual functional capacity based

3 - OPINION AND ORDER

on limitations from all of her impairments, and (4) meet his burden at Step Five of showing there are a significant number of jobs in the national economy that she could perform. Despite these arguments, I find that the ALJ's decision is supported by substantial evidence in the record.

## I. The ALJ's Treatment of the Treating Physician's Opinion

Ms. Stanley argues that the ALJ erred as a matter of law by failing to give adequate weight to the opinion of her treating physician, Dr. Oelke, who completed a medical impairment questionnaire for this claim. Specifically, Ms. Stanley argues the ALJ erred by failing to give specific and legitimate reasons for discounting Dr. Oelke's opinions as reflected in the questionnaire.

There are three types of medical opinions in Social Security cases: those from treating, examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating physician is entitled to "special weight" because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989) (citation omitted).

If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (citation omitted).

It is well-established that "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also Crane v.*

4 - OPINION AND ORDER

*Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may "permissibly reject[] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions"). A "physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of [her] symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan v. Comm'r Soc. Sec. Admin*, 169 F.3d 595, 602 (9th Cir. 1999) (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)).

The ALJ did not commit legal error in discounting Dr. Oelke's opinions. The ALJ pointed to specific and legitimate evidence in the record for giving them "little weight." Specifically, the ALJ stated that, when providing his opinion of Ms. Stanley's limitations, Dr. Oelke "did not identify supportive objective signs or findings and the signs and findings noted in his medical records were not consistent with the limitations he identified." Furthermore, the ALJ found the questionnaire to be conclusory and without adequate explanation for how Dr. Oelke's opinions were supported by medical evidence. Inconsistency with the medical record is a specific and legitimate reason to limit the weight given to a medical opinion provided by a treating physician. Similarly, finding that an opinion is conclusory and unsupported by the medical evidence in the record is also a specific and legitimate reason to discount that opinion. Accordingly, the ALJ provided specific and legitimate reasons for discounting Dr. Oelke's opinions. Thus, he did not commit legal error.

**II. The ALJ's Assessment of Ms. Stanley's Credibility**

Ms. Stanley argues that the ALJ erred in failing to give adequate reasons for discrediting her credibility. In general, the ALJ assessed that her testimony related to the intensity, persistence, and limiting effects of the symptoms from her impairments was not entirely credible,

5 - OPINION AND ORDER

and he did not believe Ms. Stanley had been forthcoming in reporting her medical needs to providers or in testifying in support of her disability insurance claim.

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which [] testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). However, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying and prior inconsistent statements concerning the alleged symptoms. *Smolen*, 80 F.3d at 1284. And, if the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas*, 278 F.3d at 959.

In assessing a claimant's credibility, the ALJ may consider objective medical evidence and the claimant's treatment history, as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id.* Specifically, when a claimant's work history undercuts her assertions, the ALJ may rely on that contradiction to discredit the claimant. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (discrediting

a claimant's pain testimony because he admitted to at least one doctor he was laid off rather than injured, and because he waited nine months after he was laid off before seeking any medical attention).

The ALJ's assessment of Ms. Stanley's credibility is supported by substantial evidence in the record. The ALJ determined that Ms. Stanley's medically determinable impairments could reasonably be expected to cause some of the symptoms she alleged. But he found that her testimony about the severity of the symptoms was not fully credible for several reasons.

First, the ALJ believed that Ms. Stanley's poor work history prior to the amended onset date suggested she had "little internal motivation to return to [the] workforce." Second, he noted that Ms. Stanley's testimony was inconsistent with the medical record. For example, she asserted that her cardiac symptoms began long before her myocardial infarction, but the longitudinal evidence did not show any continuous complaints of a cardiac nature. Third, her testimony about the extensive limitations that resulted from her asthma and allergies was not supported by her treating providers' notes, which indicated that these conditions were stable. Fourth, a cardiac specialist who evaluated Ms. Stanley noted that she was "somatically focused, as having a non-diagnosed cardiac problem without significant objective findings, and as determined to have something physically wrong with her." In fact, despite their advice to stop taking certain medications, Ms. Stanley refused to do so and asserted that she still needed the medication. Finally, the ALJ noted that Ms. Stanley had not required emergent care related to her alleged cardiac symptoms since 2012, which was inconsistent with the frequent cardiac episodes Ms. Stanley claimed she experienced since that time.

The ALJ's reasons for finding Ms. Stanley to be not fully credible are clear, convincing, and sufficiently specific for me to determine that his decision was not arbitrary. The

inconsistency between Ms. Stanley's testimony about her respiratory problems and cardiac problems with the medical record supports the ALJ's finding that she was not fully credible. Ultimately, even though variable interpretations of some of the evidence may exist, the ALJ's analysis was nonetheless reasonable, such that it must be upheld. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004).

### III. The ALJ's Formulation of Ms. Stanley's Residual Functional Capacity

Ms. Stanley argues that the ALJ erred in formulating her residual functional capacity because he (1) failed to consider the restrictions that resulted from her asthma, allergies, and other respiratory problems, (2) dismissed any limitations she had due to the deformity in her index finger and hearing loss in her right ear, and (3) failed to consider the fatigue and pain that she experienced.

At Step Two of the sequential evaluation process, "the ALJ assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limits his ability to do basic work activities." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Id.* (citation omitted). Even if an impairment was at one time considered severe, improvement in the symptoms, signs, or laboratory findings associated with the impairment may suggest that it is no longer disabling. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). In addition, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility" for social security benefits. *Id.* (explaining that "the key question is . . . whether the severity of the problem ha[s] decreased sufficiently to enable [the claimant] to engage in gainful activity").

An individual's residual functional capacity is the most "an individual can do despite his or her limitations or restrictions." SSR 96-8p, 1996 WL 374184 (July 2, 1996). Limitations from non-severe impairments are still considered in formulating an individual's residual functional capacity. *Id.* ("[L]imitations due to [] a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."). Only limitations supported by substantial evidence must be incorporated into the residual functional capacity and, by extension, the dispositive hypothetical question posed to the vocational expert. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198.

### A. Asthma

Ms. Stanley argues that ALJ erred in failing to include her asthma as a severe impairment at Step Two and in failing to include limitations that resulted from her respiratory problems in her residual functional capacity.

The ALJ acknowledged that the medical evidence showed Ms. Stanley had a history of seasonal and environmental allergies, asthma, and recurrent infections of the upper respiratory system. Ms. Stanley was treated by specialists who worked to determine her allergic triggers and develop an appropriate treatment regimen. But the ALJ noted that as of 2012, treatment records described Ms. Stanley's asthma as stable and in remission, so long as she controlled the infection she had in her ear. Similarly, the ALJ noted that Dr. Oelke's records did not mention asthma as a predominant concern during the period at issue. In addition, Ms. Stanley admitted at the hearing that her allergies and asthma had existed for many years before she was unable to work, and therefore, she had been able to work around whatever minimal accommodations she required to

avoid potential triggers. Finally, the ALJ was troubled by a lack of third-party statements supporting Ms. Stanley's claims that she had difficulty dealing with environmental factors at work.

The medical evidence in the record from around June 30, 2012, does not contradict the ALJ's finding that Ms. Stanley's asthma was under control and that her respiratory problems did not pose more than a minimal effect on her ability to work at that time. Indeed, a review of Ms. Stanley's medical records suggests that she was not suffering from respiratory problems between May 4, 2012 and June 30, 2012. Accordingly, the ALJ's finding that her asthma and allergies were not a severe impairment at Step Two is rationally supported by the evidence in the record.

Still, in formulating Ms. Stanley's residual functional capacity, the ALJ had to consider whether her allergies, asthma, and other respiratory problems resulted in functional limitations that, in combination with her other impairments, impeded her ability to work. Ms. Stanley argues that the ALJ committed error in failing to restrict the environments where she may work.

Ms. Stanley testified that her asthma and allergies impacted her ability to work. She asserts that, even when her asthma is under control, she has significant environmental limitations. She believes the ALJ assumed environmental limitations were unnecessary if her asthma was under control, which she contends was an erroneous assumption, since she is still limited in where she may work.

For example, while working as a massage therapist, she explained that she ran a scent-free office and used scent-free products. When her clients arrived smelling of cigarette smoke, she suffered asthma attacks and had to go home. Similarly, Dr. Oelke opined that Ms. Stanely's history of asthma and other respiratory impairments required her to avoid exposure to gasoline or

other industrial fumes, perfumes, aftershaves and other scents, cigarette smoke, dust and dust mites, dog and cat hair, industrial cleaning fluids, pollen, grasses, and scented cleaning products.

In declining to include further environmental restrictions in Ms. Stanley's residual functional capacity, the ALJ noted that "the medical record showed her treating providers considered [Ms. Stanley's respiratory condition] stable and under control."  As explained above, Ms. Stanley's treatment records did not show that respiratory problems were a concern during the time period at issue in this case and the record suggests that her respiratory problems were well-controlled on medication.  Similarly, Ms. Stanley did not testify that she was limited in her daily activities, specifically in terms of places she could go, as a result of her asthma and allergies.  Further, as previously explained, the ALJ properly gave reduced weight to Dr. Oelke's opinions and to Ms. Stanley's testimony.  Accordingly, the ALJ's failure to include environmental limitations in formulating Ms. Stanley's residual functional capacity is rational based on the evidence in the record.

### B.  Index Finger

Ms. Stanley argues the ALJ erred by failing to include limitations that resulted from her deformed index finger in her residual functional capacity.  In November 2010, Ms. Stanley dislocated a joint on her left second finger while trying to break her fall.  Three weeks after the injury, she had reduced flexion at the joint and her doctor prescribed home hand exercises.  Ms. Stanley still experienced problems with her finger in March 2011, and sought treatment.  That doctor recommended hand therapy and reconstructive surgery.  In May 2011, Ms. Stanley sought an orthopedic evaluation because she believed the lack of motion in her finger was interfering with her ability to work as a massage therapist.  Dr. Kenneth Butters, M.D., an orthopedic specialist, provided multiple surgical options for improving the functionality of the finger.  Ms.

Stanley claims she did not have surgery because she lost her health insurance. She also claims the injury ultimately caused, or at least played a part in, her decision to stop performing self-employed massage therapy work.

The ALJ determined that the finger deformity was not a severe impairment and that it would not interfere with work activity more than minimally. In making this determination, the ALJ noted a lack of objective findings to establish that the deformity caused any grip problems. In addition, he did not believe that Ms. Stanley performed hand therapy exercises regularly, as prescribed.

The ALJ's finding that Ms. Stanley's injured finger would not interfere with work activity more than minimally is supported by the record. On the questionnaire filled out by Dr. Oelke, when asked if Ms. Stanley was limited in her ability to complete repetitive bimanual actions or in doing fine detail work, he responded "no." Additionally, he responded "no" to the question of whether he would expect her workplace to be impacted by her injured finger. At her hearing, Ms. Stanley testified that she could not work as a massage therapist because of her injured finger. But she did not state that the injury otherwise limited the use of her hand for other purposes, including normal daily activities. Accordingly, the ALJ's determination that her finger injury would only minimally interfere with Ms. Stanley's ability to work is supported by the record, and he did not err in failing to include additional limitations in her residual functional capacity.

### C. Hearing Loss

Ms. Stanley argues that the ALJ erred in dismissing limitations that result from her documented hearing loss in her right ear. Medical records show that Ms. Stanley has right-sided hearing loss, and Ms. Stanley testified that she lost all hearing if she blocked her left ear because

she had virtually no hearing in her right ear. The ALJ noted, however, that she was able to understand normal conversational tones and volumes during the hearing. Based on his observations and the evidence in the record, he determined that her hearing loss would not result in more than minimal work-related limitations. Accordingly, he did not find hearing loss to be a significant impairment and he did not include any limitations in Ms. Stanley's residual functional capacity specifically related to her hearing loss.

It is unclear exactly what limitations Ms. Stanley believes result from her hearing loss. While she argues the ALJ erred in not taking this impairment into consideration when formulating her residual functional capacity, she does not point to any evidence in the record to support a finding that she experienced any additional functional limitations as a result of her hearing loss. In fact, Dr. Oelke did not ascribe any limitations based on her hearing loss in the medical impairment questionnaire he completed, suggesting he was not concerned about any limitations. Thus, because there is no evidence that Ms. Stanley's hearing loss significantly or even minimally impacts her ability to work, the ALJ did not err in failing to find it to be a significant impairment and in failing to include any hearing-related limitations in Ms. Stanley's residual functional capacity.

### D. Pain and Fatigue

Finally, Ms. Stanley argues the ALJ erred in failing to properly assess the limitations she experiences as a result of pain and fatigue. Again, Ms. Stanley fails to articulate exactly what additional limitations should have been included in her residual functional capacity, and what objective evidence in the record supports such limitations. Presumably, Ms. Stanley believes that her pain limits her to performing less than medium work, which was the residual functional

capacity determined by the ALJ. In addition, she likely believes that her fatigue further limits her ability to work because she will be absent too often to maintain employment.

The only evidence in the record supporting a more limited residual functional capacity as of her date last insured is Dr. Oelke's medical impairment questionnaire and Ms. Stanley's testimony. Ms. Stanley testified that her vascular spasms made her exhausted and required her to lay down. In terms of her non-exertional limitations, Dr. Oelke opined that her pain and fatigue was occasionally severe enough to impair her ability to maintain attention and pace for sustained periods of time, that she could have coronary spasms that would require her to rest for thirty to sixty minutes before returning to work, and that she could miss four or more days a month as a result of her work-related impairments. As to Ms. Stanley's exertional limitations, Dr. Oelke opined that she could stand and/or walk for up to two hours a day, that she could spend less than two hours a day in a sitting position, and that she could only carry up to tend pounds a day. During the hearing, the vocational expert testified that those additional exertional limits would preclude medium work and the non-exertional limits would preclude all work.

As explained above, however, the ALJ properly discounted Dr. Oelke's opinion, and he properly found Ms. Stanley's testimony not fully credible. Accordingly, the ALJ did not err by failing to include any additional exertional and non-exertional limitations in Ms. Stanley's residual functional capacity.

### IV. Whether the ALJ Conducted an Accurate Step Five Analysis

At Step Five, the ALJ determined that there were jobs in the national economy that Ms. Stanley could perform, given her age, education, and residual functional capacity. Ms. Stanley contends that the ALJ based his decision on the opinion of the vocational expert, which was based on an incomplete hypothetical that failed to accurately reflect her limitations. Specifically,

Ms. Stanley argues that the three jobs the vocational expert found she could perform were not accurate because the ALJ's hypothetical questions were based on an inaccurate residual functional capacity. I disagree.

Limitations supported by substantial evidence must be incorporated into the residual functional capacity and, by extension, the dispositive hypothetical question posed to the VE. *Osenbrock*, 240 F.3d at 1163-65.

As discussed above, the statements by Ms. Stanley and Dr. Oelke's opinions were properly discredited by the ALJ. Accordingly, Ms. Stanley's argument, which is contingent upon a finding of harmful error in regard to these issues, is without merit. *Bayliss*, 427 F.3d at 1217 ("The hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record. The ALJ's reliance on testimony the VE gave in response to the hypothetical therefore was proper."). Accordingly, Ms. Stanley's argument fails.

## CONCLUSION

For the reasons stated, I find the ALJ's decision was supported by substantial evidence. Accordingly, I AFFIRM the decision. This case is DISMISSED with prejudice.

IT IS SO ORDERED.

DATED this __23rd__ day of March, 2017.

/s/ Michael W. Mosman\
MICHAEL W. MOSMAN\
Chief United States District Judge